**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

**CIVIL ACTION NUMBER:**

**2:20-CV-11159**

**MOTION**

**JUDITH HENRY,**

**Plaintiff,**

**v.**

**ESSEX COUNTY, et als.,**

**Defendants.**

**Martin Luther King Building & U.S. Courthouse**
**50 Walnut Street**
**Newark, New Jersey 07101**
**Wednesday, March 29, 2023**
**Commencing at 11 a.m.**

**B E F O R E:**

**THE HONORABLE KATHARINE S. HAYDEN,**
**UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S:**

LAW OFFICES OF TISHA ADAMS, LLC
BY: TISHA N. ADAMS, ESQUIRE
60 PARK PLACE, SUITE 1103
NEWARK, NEW JERSEY 07102
FOR THE PLAINTIFF

Laurie A. Engemann, Official Court Reporter
Laurie_Engemann@NJD.USCourts.gov
(973)776-7714

**Proceedings recorded stenographically.**
**Transcript produced by computer-aided transcription.**

**APPEARANCES CONTINUED:**

**OFFICE OF THE UNITED STATES ATTORNEY**
**BY: BROOKS E. DOYNE, ASST. U.S. ATTORNEY**
**970 BROAD STREET7TH FLOOR**
**NEWARK, NEW JERSEY 07102**
**FOR THE FEDERAL DEFENDANTS**

**PENNSYLVANIA OFFICE OF THE ATTORNEY GENERAL**
**BY: KEVIN R. BRADFORD, ESQ.**
**1600 ARCH STREET, 3RD FLOOR**
**PHILADELPHIA, PENNSYLVANIA 19103**
**FOR THE COMMONWEALTH DEFENDANTS**

**NEW JERSEY ATTORNEY GENERAL'S OFFICE**
**BY: ALEX R. SCHMIDT, ESQ.**
**124 HALSEY STREET, 5TH FLOOR**
**NEWARK, NEW JERSEY 07101**
**FOR THE DEFENDANTS, N.J. ATTORNEY GENERAL,**
**ESSEX COUNTY PROSECUTOR'S OFFICE, AND NARVIN SINGH**

**HOLTZMAN, McCLAIN & LONDAR, P.C.**
**BY: LILIA LONDAR, ESQ.**
**524 MAPLE AVENUE, SUITE 200**
**LINWOOD, NEW JERSEY 08221**
**FOR THE CFG DEFENDANTS**

**OFFICE OF THE ESSEX COUNTY COUNSEL**
**BY: ALAN R. RUDDY, ESQUIRE**
**465 DR. MARTIN LUTHER KING BOULEVARD, ROOM 535**
**NEWARK, NEW JERSEY 07102**
**FOR THE ESSEX COUNTY DEFENDANTS**

**CIPRIANI & WERNER, P.C.**
**BY: MICHAEL D. PUGLIESE, II, ESQUIRE**
**485 ROUTE 1, SOUTH BUILDING E., SUITE 120**
**ISELIN, NEW JERSEY 08830**
**FOR THE DEFENDANT LACKAWANNA COUNTY PRISON**

**(PROCEEDINGS held in open court before**
**The Honorable KATHARINE S. HAYDEN,**
**United States District Judge, at 11:25 a.m.)**

THE COURT: Good morning, everybody. Everybody may be seated.

We are here in the matter of *Judith Henry versus Essex County* and a variety of defendants, but essentially defendants can be siloed into the commonwealth defendants, the Essex County defendants, and the federal defendants.

So counsel's appearances?

MS. ADAMS: Attorney Tisha Adams on behalf of Ms. Judith Henry the plaintiff.

MR. DOYNE: Good morning, Your Honor. Assistant United States Attorney, Brooks Doyne on behalf of the federal defendant.

MR. BRADFORD: Good morning, Your Honor.

Kevin Bradford from the Pennsylvania Attorney General's office on behalf the Pennsylvania defendants.

MR. SCHMIDT: Good morning, Your Honor.

Alex Schmidt on behalf of the Attorney General's Office and the Essex County Prosecutor's Office and Narvin Singh.

MS. LONDAR: Good morning. Lilia Londar on behalf of the medical defendants.

MR. RUDDY: Alan Ruddy from Essex County Counsel's

Office, for multiple Essex defendants.

THE COURT: And I believe both attorneys who are on the L part of the table don't have live motions?

MR. RUDDY: That is correct.

MS. LONDAR: That is correct.

MR. PUGLIESE: Good morning, Your Honor.

Mike Pugliese from Cipriani & Werner, for the Lackawanna defendants.

THE COURT: And you also don't have a live motion?

MR. PUGLIESE: That is correct, Your Honor. Just here to observe and report.

THE COURT: Okay. Welcome everybody. We gave you nice weather, all of you who came from out of state.

All right. I have a question. It is a quiz. The first one who has the answer just raise your hand and you will be recognized. When was the original arrest warrant issued for Judith Maureen Henry? You can't look at your notes, keep your eyes up at me.

MR. BRADFORD: I'm new to the case, Your Honor, but according to my former colleague's motion it was January 29, 2019, is when the --

THE COURT: No. No. No. That is when something happened. That was July. That is when something happened that started the extradition, but the whole reason they wanted Judith Henry -- stop looking. Stop looking.

The whole reason they wanted Judith Henry was for a parole violation. Right? I mean that is why she was a bad person that they arrested. Right? All right. So when was that warrant issued?

MS. ADAMS: I only remember the year. I don't remember the month. It was 1993.

THE COURT: That is the point. That is the point. And the month was October. October 1993. No one mentioned that. No one thought it was important. I, frankly, think it is important.

One of the defendants took the position on the personal jurisdiction issue, I think it was the commonwealth defendants, that this is a case about false arrest.

This is an extradition case. That is what this case falls into, that category. And that is what is animating my reaction, and my observations on these motions.

So let me just encapsulate them to the extent that people prepared for oral argument. There are places where you conduct your oral argument in, but please assume, you have been here before, I'm familiar with the record. I'm familiar with the papers that you filed. I know everybody worked hard on it.

And I know that everybody presented sophisticated arguments that have to do with the liability of public officials, the doctrine of qualified immunity. The ever

present issue of this court's subject matter jurisdiction based upon personal jurisdiction. I know all of that is important to you in terms of your advocacy.

I want today to be about that fact that the original arrest warrant was issued in October of 1993. And the events of 2019. And so I'm going to review them as I glean them from the record. And we will take the next steps from there.

(Brief recess.)

THE COURT: So we begin with the issuance of the arrest warrant. And now I'm talking about the second one that was issued signed by defendant, Margaret Thompson, who was the Director of Interstate Parole Services for the Pennsylvania Board of Probation and Parole. That was on July 29, 2019.

The record is silent on what prompted Margaret Thompson to issue that second warrant. I don't expect anybody seated here today to have the answer since only Ms. Adams knew that there was an original warrant in 1993. So that becomes a question.

Why was that warrant issued so long ago? And why was it acted upon in 2019? Does the remoteness of time have any play? I don't know.

Were there other attempts to arrest absconder Judith Henry? Did any of them result in improper or proper arrests of our Judith Henry?

There is some passing reference in emails that were

going back and forth in September 3, 4, and 5 of 2019 that suggests that her name keeps, quote, popping up. I don't know what the answer to that is.

Maybe it is related to other efforts to do something with this 26 year old warrant. I don't know. And the record is not clear at this point. Does it play a role in my ultimate decision as to whether or not this matter goes to a jury? I don't know. Nobody knows. I think it deserves following up.

We have the identification of Ms. Henry as the next event after that July 29, 2019, arrest warrant was issued. Unnamed authorities in Pennsylvania requested the U.S. Marshals assistance in arresting Henry.

Included in the records, specifically D.E. 143 at page 50 is an August 14, 2019, quote, Report of Investigation, that was authored by Gary Duncan a criminal investigator with the marshal service and approved by Steven Rowe, a criminal investigator.

That indicates that M/PA, I don't know what that means, requested assistance with the arrest of Judith Maureen Henry wanted for absconding from Pennsylvania parole supervision. That is a direct quote from the D.E. 143, page 50 from the report of investigation.

And that document also indicates that the warrant for her arrest was issued back in October of 1993. That report

also refers to information included on a, quote, profile page, end quote. Which is unidentified and not known at this time.

The document indicates that, quote, The photos on the profile page match the photos of Henry's New Jersey driver's license which listed the same name, date of birth, and social security number as Henry's PA Board of Probation and Parole records. End quote.

There is indication throughout, we wouldn't be sitting here, that our Judith Henry the one that Tisha Adams represents cannot be the same as the absconder, Judith Henry. And, therefore, the statements on page 50 of Document 143 appear to be, or are incorrect or at the very best are confusing. It is also unclear from the record who in Pennsylvania asked for the U.S. Marshals assistance.

Defendant Timothy Riegle, who is a named defendant who was a parole staff technician with the Pennsylvania Board of Probation and Parole; he appears to have been intimately involved in Henry's arrest in Newark and extradition to Pennsylvania. Although he denies in a signed declaration having anything to do with identifying our Henry as the absconder.

Compare the third amended complaint in paragraph 18 with the declaration which appears at D.E. 98-2 paragraphs 8 and 9. Regardless of whether Riegle was involved in identifying our Henry as the absconder, it is clear from the

Gary Duncan report that is on page 50 that someone in Pennsylvania was involved with that identification.

What we don't know, and what I think is vital for everybody seated on the defense side is what is the practice and procedure in an extradition case? It is shrouded in mystery. I have TFOs, task force officers. Why are TFOs involved?

I don't know how this works. Nobody is telling me how it works. I would dare say just as nobody could answer the question about when the original warrant was issued nobody knows and that is why this case has to go forward and we gather the information.

I was very taken with that whole *Bivens* extension argument that is made on behalf of the federal defendants. You may be 100 percent right, but until we know what extradition means, I don't know if I should extend this. Do you understand, Mr. Doyne? It is tough. We don't know.

And if I take this as an extradition case and I believe I have every reason to believe I need to take this as an extradition case because that is what we are all talking about; then what is proper extradition and what is improper extradition, if people even know what a practice is, has to be before the court.

And that is why more information has to be gathered, information gathered from the players. Not from scattered

documents. Which is all I had to deal with. And, frankly, all you had to deal with in terms of dealing with the motions that are before me.

Now we go to Pennsylvania. She is picked up in Newark by virtue of this joint task force officer, Mr. Jackson. He signs or produces information in a report that is on D.E. 143, page 48.

(Reading.)

> This office converged on the address you provided in Newark to apprehend your subject Judith M. Henry, on your outstanding arrest warrant for Pennsylvania state parole.
>
> Henry was identified and placed under arrest without incident. Henry was transported to the Essex County sheriff's office central booking for processing on your outstanding CDS warrant and parole violation.
>
> Once completed, Henry was transported to Essex County correctional facility awaiting to be extradited to Pennsylvania. All extradition arrangements are through the Essex County Prosecutor's office.

(End of reading.)

THE COURT: Now if that is the only piece of paper we had, we would go, well, okay. We got all of the named players by virtue of Mr. Jackson or TF Officer Jackson's report, but of course all of you want to make arguments that none of that

is important because you did your job right. And maybe you did. I just don't know what the practice and procedure is and whether anybody strayed.

I do know things went horribly wrong. You all know things went horribly wrong. And a lawsuit has been brought and I believe deserves to go further than all of you on the defense side would like it to go in order to determine whether what went horribly wrong has a remedy in the law.

Following through, when she gets to Pennsylvania. She is transported from Essex County jail to Lackawanna prison on September 1, 2019. The next day she is transferred to SCI-Muncy.

Defendant's Captain Savage and Lieutenant Beckley failed to fingerprint her upon her arrival at SCI-Muncy. The next day she is fingerprinted, September 3rd, by Elizabeth Cooper. And that is when the Pennsylvania officials realize there is a problem.

At 12:37 p.m. on that day defendant, Denise Wood, a records administrator emails Thompson, Margaret Thompson, that I referred to earlier indicated she contacted AFIS. Anybody knows what AFIS is? Okay. Neither do I.

Which confirmed that, quote, The prints taken today do not match the prints that they have on file, end quote, for absconder Henry and further indicate, that, quote, the same thing happened, end quote, back in 2000. And an individual

named Don Young was given, quote, information, end quote, about the mistaken identification.

That is why I said earlier maybe this ancient 1993 warrant that all of this money is being spent on, I would not want to be a taxpayer from Pennsylvania or the federal government and know that we are talking about an absconder back in 1993 whose conviction apparently had to do with a conspiracy to distribute cocaine back in 1993 and is the subject now of this bloated effort on the part of a lot of, perhaps, very well-meaning officials. But, in any event, something happened in 2000.

A few minutes later in terms of this email exchange Margaret Thompson emails Riegle indicating that Wood, quote, confirmed that Henry is not the same person, so she should be released. That is September 3rd.

But Henry is not released. Instead Thompson and other Pennsylvania employees discuss having Henry taken to reception or intake to have a high resolution photograph taken of her fingers and hands to check for damage or alterations.

I guess on this parole violation the absconder, it is suggested, had her fingers altered so that she could escape the parole violation warrant.

The next day Henry is not released. Instead conversations continue. At 11:14 a.m. Thompson asks if anyone is, quote, doing anything further to verify whether or not

Henry is our offender, end quote. Thompson also indicates, quote, If there is nothing else we can do, Henry will need to be released. End quote.

Later that morning nondefendant Joseph Gillespie, FAST Coordinator for the U.S. Marshal Fugitive Task Force in Pennsylvania, who is not a defendant as I indicate, circulates a photograph of absconder Henry from 1993 and indicates that the absconder is approximately five-feet six inches or five-feet seven inches noting the, quote, big difference, end quote, of the five-foot two inch Henry who is in custody. That Henry who is in custody is our plaintiff.

Despite AFIS confirmation of the mistaken identity on September 3rd and further discrepancies brought to life on September 4th, plaintiff Henry is not released from Pennsylvania custody until September 5, 2019.

Questions that remain therefor is: What information did Pennsylvania receive about plaintiff Henry 20 years ago? Where was this information? Why didn't anybody check that information? Particularly after Henry was continually protesting her innocence. And everybody knew, or should have known that the warrant that started, that unspooled this unfortunate series of events was issued in October of 1993, 26 years earlier.

Why didn't authorities compare our plaintiff Henry's characteristics to those of absconder Henry sooner than they

did? This information seemed to be available to Gillespie. Gillespie is identified as somebody on the federal side of things. Did his physical characteristics information come from the profile photo that Gary Duncan referred to on page 50 of D.E. 143.

Counsel, I'm asking all of these questions because I poured over your papers. And I also looked at what your papers didn't -- and I, granted, didn't know at the time that the motion was filed because they came with Ms. Adams' opposition papers. But they were in your hands.

At some point you had an opportunity to file replies or to say, Whoa, we need to know more about this so that Judge Hayden isn't sitting in her house piecing together pieces of paper because we like Judge Hayden. We don't want her to have to work this hard.

But nobody is paying attention to this granular stuff, which is, of course, what lawsuits are all about. Everybody is telling me about *Bivens* and extensions of *Bivens* and subject matter jurisdiction and personal jurisdiction and how none of this ever should see the light of day because we have all of these legal remedies that Ms. Adams should know about and should not go forward with her case because of; and I really don't agree with that.

Now the one person who has every reason to squawk about the position that I'm taking today, which I've hinted

already is a denial of the motions, is defendant Singh. And I recognize that Narvin Singh, who is a legal assistant for the Essex County Prosecutor's Office Extradition Unit appears to be a small player in these circumstances. But his involvement at this point, given the huge question marks all floating around here, is not inconsequential.

On August 23, 2019, remember she was arrested August 22nd, transported on September 1st. So this is while she was with Essex County. Singh forwarded a facsimile notification to defendant Riegle advising that the Pennsylvania Department of Corrections had until September 3, 2019, which was Labor Day that year to take custody of Henry. Or maybe Labor Day was September 2nd.

The fax's subject line is, quote, Judith Maureen Henry date of birth 4/29/1962. The date of birth Singh included on the fax appears to be different than the date of birth that is included on Riegle's extradition facts from earlier that day. Although the date of birth has been redacted by Ms. Adams in the papers that we have.

Singh could have -- should he have? I don't know. I don't know how this works. This is an extradition case. We don't know the process yet. -- recognized the discrepancy and inquired into the issue.

That is where Singh stays in, because he is part of the extradition unit. His fax is wrong.

I'm not saying that I agree with Ms. Adams that there is some conspiracy going on here. Quite, frankly, I think this whole issue of conspiring, has more to do with combatting the law everybody is citing, which law may or may not apply, because this is an extradition case.

But in any event, I am saying that Singh stays until there is more clarity as to what his role should have been. We kind of know what it was. But we don't know the import of the documents that were going back and forth during August of 2019.

And we don't know what information Singh did have at his disposal while he was coordinating. Remember that is what he was doing, he was coordinating the extradition and transportation of Judith Henry. That is why I say the role he played is not inconsequential.

So getting to the law, and believe me this transcript or this oral opinion may suggest that I'm going, The hell with the law. I'm not doing that.

I'm breaking apart the facts as carefully teased out of the record by myself, but not really terribly clear as to how they all coordinate, but I'm putting that in one bunch. Then I'm putting in the other bunch and I'm addressing now the law as we know it.

And the trouble with cases like this is each of them is so fact sensitive and results in blurbs. And when you

start doing the computer research you go to, Well, what is the law, and you cite it because it looks good and it is on your side. And I understand that. But it is always preceded by facts which should be in the opinions that count, very well put out, clearly.

And that is why the really important cases, the ones that we do rely on happen on the summary judgment level and not on the motion to dismiss level. Which all of you knew when you were making these motions is a stumbling block. But again the law, the applicable law, very much seems to favor, if you ignore these granular unexplained facts the positions that were taken.

I'm not faulting the advocacy here. I am saying, however, that the application that you want me to make I believe very strongly is unclear.

Now, can I just, before I jump into that law, Ms. Adams, would you confirm what I'm glean from the record that your client concedes that the official capacity claims against all, the official capacity claims, against all of these defendants they are dismissed? We are talking about individual personal, are we?

MS. ADAMS: Yes, Judge.

THE COURT: Okay. Fine. I just wanted to make sure. I'm making that assumption. I just wanted to double check.

Okay. So Pennsylvania defendant's motion to dismiss

which is D.E. 98, I find that the allegations in the third amended complaint supplemented by the documents that I've referred to already beginning on page 48 of D.E. 143.

(Reading.)

I believe that the allegations and those documents are sufficient to establish personal jurisdiction over each of the commonwealth defendants.

The wrongs that were committed against Henry occurred during one continuous loop. And had the origins both in Pennsylvania where the warrant for absconder Henry, both of them, were issued and New Jersey where Henry was arrested.

(End of reading.)

THE COURT: Henry was not arrested fleeing. She was not arrested having anything to do with the crime. She was sitting in her home and she was arrested on a 1993 warrant. Which is why I'm saying this is an extradition case. And if it is an extradition case there is that loop between the two states, Pennsylvania that originally wanted her, that still wanted her, and that got her from New Jersey.

The wheels began turning in Pennsylvania when someone, presumably somebody from Pennsylvania Probation and Parole Board under Director Thompson's supervision, although Riegle says it wasn't me, determined that the absconder was our plaintiff Henry, a New Jersey resident. And that person

enlisted the help of the U.S. Marshals to confirm the identification.

Somewhere in the record there is the suggestion or there is a fact that there is a national database. So I assume somebody took this ancient 1993 document, warrant, and looked at whatever identifiers were there and Judith Maureen Henry popped up. Maybe a lot of Judith Maureen Henrys popped up. I don't know but they chose the one in New Jersey.

Were there links? Probably. Maybe there was nothing wrong with that. Maybe that was the innocent act that started the whole thing, but is not actionable because it was, according to *Hoyle*, and that is what you are supposed to do.

Should there have been a review because it was a 26 year old warrant? I don't know. You are going to tell me as a result of discovery.

Henry was, we know, wrongfully arrested. I'm not using "wrongfully" as a legal thing, bingo, bingo, we start the Constitutional cases. I'm saying the wrong person was arrested. Plaintiff Henry was the wrong person. She was not the absconder. That is not at issue.

She was taken to Essex County jail and stayed there for five days. Only in understanding of the process will enable the court to decide culpability, if any, and, if any, the degree between and among these defendants in that piece of the events.

In the days following Henry's arrest, Riegle, the Pennsylvania employee, spoke with employees in Essex County regarding Henry's extradition to Pennsylvania. He arranged to transport her from New Jersey to Pennsylvania.

Again, the process and practice of this interaction between and among these officials when an extradition is planned and carried out must be explained. Riegle is saying, All I did is get involved in logistics.

Counsel, you have got to do better than that. "Logistics" means everything or nothing. You know, somebody gets their first job after college.

What do you do?

I'm in logistics.

Am I suppose to go, Oh, okay. I know what that is.

No. That is like marketing. We don't know what it means.

So if Riegle said, I was involved in logistics as he does in his declaration, and I had contacts with federal and New Jersey state officials, I go bingo, you are in. You stay in until we find out what those logistics were.

When Henry arrived in Pennsylvania. Again, this is plaintiff Henry on September 2, 2019, Captain Savage and Lieutenant Beckley did not fingerprint her. Their failure to do so may -- I just don't think that a failure to do so is just an innocent act. But I'm going to stay here and remain

unconvinced of anything because I don't know enough about this process.

In any event, it was a pretty big event. It is mentioned in the complaint. And it did prolong Henry's return to New Jersey because it was the mismatch of fingerprints that ultimately led to her release.

Cooper did not fingerprint Henry until the next day, September 3rd, and that is the day that all of those emails were flying back and forth regarding Henry's mistaken identity confirmed by Wood. And despite concrete knowledge of the mistaken identity, Henry was not released for another two days.

As a result of those prolonged wrongful incarceration days she received, according to the complaint, inadequate medical care. And there we go to the other side of counsel table, that is not involved in the motion. But that is how we place her there. And that is where, if there is any liability, that liability springs into the story here.

In short, all of the commonwealth defendants played a role in what is complained about in the third amended complaint. These wrongs began when she was arrested in New Jersey. They continued to impact her in New Jersey.

As the Southern District of New York indicated in *Doe versus Delaware State Police*, which appears at 939 F. Supp. 2d 313 and is a 2013 decision out of the Southern

District of New York, which I believe is cited in one of the defense briefs.

(Reading.)

When the allegations are that out of state law enforcement officials closely coordinated their activities in the apprehension and/or extradition of the defendants, courts have found sufficient contacts to support personal jurisdiction.

(End of reading.)

THE COURT: I don't think we need a case to say that it is so obvious, but we do have a case. And I agree with it.

The documents before the court now are on the commonwealth defendant's motion to dismiss demonstrate that there was indeed close, close coordination, end quote, between Pennsylvania and New Jersey. Exactly what role each commonwealth defendant played, should have played, didn't play, remains to be seen and will inevitably come to light during the course of focused discovery in this matter, and in particular depositions of the players involved.

It is far to early for any of the commonwealth defendants to be dismissed from this action on what I would call technicalities, i.e. the application of bottom line law to this event when, as I said, I'm seeing it through the lens of an extradition.

And particularly when the defendants have not, quote,

presented a compelling case that the presence of some other considerations would render jurisdiction unreasonable. And that kind of failsafe think about it point comes out of *Carteret Savings Bank F.A. versus Shushan*, 954 F. 2d, 141 at page 150, a case in 1992 from the Third Circuit.

I'm denying defendant Singh's motion to dismiss which appears at D.E. 122. He argues that he is entitled to qualified immunity as to the civil rights claims asserted against him, and further that the abuse of process and civil conspiracy claims against him should be dismissed on their merits.

We know that qualified immunity shields government officials from civil damages and liability unless the official violated a statutory or Constitutional right that was clearly established at the time of the challenged conduct.

I have such experts sitting here in front of me that I'm not going to cite the full panoply of what the law of qualified immunity is. But it does bear mentioning where Singh is concerned, because there was that flat out mistake on the second paper that he issued.

He is not running away from it. He is saying I have qualified immunity because I was doing it. There is no clearly established right here. We know how all of that works. But as I said, because he was intimately involved in that whole extradition process, knows how it works, and may

have or may have not offended his role in it, he stays in.

I also recognize that while early resolution of qualified immunity issues is desirable, factual issues or factual uncertainty may make an assessment impossible at the complaint stage. That is out of *Saint-Jean versus County of Bergen*, 509 F. Supp. 3d, 8799, Judge McNulty's opinion in 2020.

As I indicated during oral argument earlier, well, I haven't really let you do too much oral argument, have I. As I would have indicated had I let you do a lot of oral argument, factual uncertainty really is at the forefront here. I've been barking that at you all morning and it really is the problem I have here.

Only discovery can uncover Singh's true role and Henry's arrest and its aftermath. Accordingly, dismissal on qualified immunity of the claims against him is improper.

I will not dismiss the abuse of process and civil conspiracy claims on their merits. At its core the third amended complaint alleges that Singh should have recognized discrepancies in Henry's mistaken identity but failed to do so. Whether that is in fact the case, further whether he acted intentionally because there was some, I don't know what kind of Shenanigans going in if any, and I really mean that, if any, with respect to the role of the Essex County defendants or the interaction with the Pennsylvania defendants

on this extradition based upon a 1993 warrant, these are all issues that await discovery.

Finally, I'm denying the federal defendants motion to dismiss under 12(b)(6). The documents that I've referred to, particularly those attached to D.E. 143 demonstrate that the federal defendants played an important role in the identification of plaintiff Henry, which was mistaken, and ultimately arrested and facilitated her arrest based upon that improper identification.

Nor, again, does qualified immunity play a role here as explained earlier, while early resolution is desirable, factual issues or factual uncertainty may make an assessment impossible at the complaint stage. Factual uncertainty is all over where we are at this point in the case.

What role each federal defendant played, what a TFO means in this whole process, how extradition works, whether it worked properly here; all of these circumstances have to be delved into. All of that remains to be seen and must be explored further in discovery.

It is also too early to dismiss Judith Henry's claim against the federal defendants on technicalities like immunity under the Federal Tort Claims Act or *Bivens*. Without further development of the factual record, I can't determine the true nature of the claims against each federal defendant.

Accordingly, dismissal at this early stage, God, I

say early stage, but it really is, but this case has been going on forever. And I hope we can move it more swiftly than we have, particularly where the documents in the record indicate that a wrong has occurred. And let's not look away from that. A wrong has occurred. We are not in doubt about that.

This is not a matter of a police officer shooting somebody in the back and having strong claims for qualified immunity. This is a matter of mistaken identity that stretched out for a long period of time, with a lot of people playing a role in the perpetuation of that mistaken identity.

So structured, enforced discovery steps are going to happen under Judge Waldor's supervision. There has been a lot of ink spilled and a lot of money spent thus far. And all I have before me is a frustrating record that details, and not enough, harmful series of events involving public employees who carried out, at times, inexplicable steps to capture someone. A woman who appears, at best, to be a petty criminal and whose offense that led to all of this took place over a quarter of a century ago.

We are not even talking about harm to the public. We are talking about not doing the right thing as a parolee. That this much bumbling attention was paid is a mystery that deserves solving before Ms. Henry's claims are cast aside.

No one can deny that she suffered for two weeks in

the late summer of 2019, but no one here in this courtroom will accept responsibility. And we will see when all of the facts are in if the law works that away. Maybe it does. And maybe it doesn't.

So I'm denying motions appearing at 98, 122, and 139, except as to the official capacity claims against the moving defendants, which Ms. Adams has confirmed must be dismissed. We will issue an appropriate order.

And I have, counsel, for you waiting Judge Waldor. And she will work with you to get a reasonable and I hope effective efficient discovery schedule.

Ms. Adams, it is absolutely required that you get your client and you to appear at depositions. And that these depositions take place. We can't have this sprawling out, and there have been times where you haven't been where we want you to be, Ms. Adams. So I need you to be where we want you to be. I needed you to be here today. And I need you to be here whenever a deposition takes place.

This is all going to involve money. This is all going to involve time. And this is all absolutely unnecessary if counsel will accept the fact that something went wrong here. That we have somebody who is innocent of any kind of activity that would require her to be in the Essex County jail, in the Muncy jail, in the Lackawanna defendant's custody. She didn't deserve any of this. She didn't cause

any of this. And we have a 1993 warrant that started all of this.

I really strongly suggest that people think about that and sit down and come to a reasonable resolution of this case. But if you won't and if you can't and if your clients won't let you or if the plaintiff's demands are unreasonable and there is a good reason to walk away from any further discussions, go forward and get those depositions taken. Get the papers to me that really count with the explanations of what they mean, so I'm not talking about anagrams and things that we can't answer.

And let's get this case moving. We should be able to get a trial some time in the fall, early in the fall. And get this thing moving. Because by that time, August of 2019 is four years away. Right? Let's move along. Let's move along.

But I can tell you right now with the exception of the medical defendants, everybody seated at counsel table played a role in the events that took place. You all represent people that were involved. And you all know what happened to her, to Judith Henry. I'm leaving out the medical defendants. She may have viable claims, but I'm talking about what we talked about today.

So everybody go upstairs including medical defendant and let's get Judge Waldor working on a schedule that fits what I need and what this case needs. You all know where she

is. Right? You have all had dealings with Judge Waldor. Yes?

MR. DOYNE: Many times, Your Honor. But not in person. So, admittedly, I do not know how to get to Judge Waldor from here.

THE COURT: Okay. Off you go in the other courthouse. What is she on the 4th floor?

THE LAW CLERK: Her courtroom is 4D.

THE COURT: 4D and she is waiting for you.

THE LAW CLERK: I just messaged them.

THE COURT: Okay. Off you go.

We will enter an order. Thank you.

MR. BRADFORD: Judge. Thank you.

MR. SCHMIDT: Thank you.

MS. ADAMS: Thank you.

(The proceedings are concluded at 12:10 p.m.)

* * *

**FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

**I, Laurie A. Engemann, CCR, CRCR, RPR,** Official Court Reporter of the United States District Court for the District of New Jersey, do hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/S/ Laurie A. Engemann CCR, CRCR, RPR* *March 31, 2023*

*Signature of Official Court Reporter* *Date*